1

2

3

4                              UNITED STATES DISTRICT COURT

5                            NORTHERN DISTRICT OF CALIFORNIA

6

7    BEATRICE PARKER,                              Case No.  18-cv-01912-HSG

8                    Plaintiff,                    **ORDER DENYING IN PART AND**
                                                   **GRANTING IN PART MOTION FOR**
9           v.                                     **CLASS CERTIFICATION**

10   CHERNE CONTRACTING                            Re: Dkt. Nos. 50, 55
     CORPORATION,
11
                     Defendant.
12

13          Pending before the Court is Named Plaintiffs Beatrice Parker and Jeffrey Gurule, Sr.'s

14   ("Plaintiffs")[1] motion for class certification  *See* Dkt. Nos. 55 ("Mot."); 56 ("Opp."), 57 ("Reply").

15   Plaintiffs seek certification of a proposed class of Defendant Cherne Contracting Corporation's

16   ("Defendant" or "Cherne") current and former hourly employees who worked for Defendant on

17   one or more of three projects in California.  On February 27, 2020, the Court held a hearing on the

18   motion for class certification.  Dkt. No. 61.  At that hearing, the Court deferred ruling on the

19   motion, and invited Defendant to file a motion for summary judgment.  Dkt. Nos. 61, 64.  On

20   March 31, 2020, Defendant filed its motion for summary judgment.  *See* Dkt. No. 70.  On August

21   6, 2020, the Court held another hearing on the motions for certification and summary judgment.

22   Dkt. No. 80.  After carefully considering the parties' arguments, and for the reasons set forth

23   below, the Court **DENIES IN PART AND GRANTS IN PART** the motion for class

24   certification.

25

26   _____

27   [1] On October 17, 2019, Plaintiffs filed a motion for leave to file a third amended complaint (Dkt.
     No. 50) to add Jeffery Gurule, Sr. as a second Named Plaintiff.  Because the Court denies Class
     Certification for the Waiting Time Subclass whether or not Mr. Gurule is included as a Named

28   Plaintiff, the Court will **GRANT** the motion to amend.  Plaintiffs are directed to file the amended
     complaint by November 24, 2020.

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

## I.   BACKGROUND

### A.   Factual Background

Plaintiff Parker worked for Defendant as an hourly-paid driver/driver-foreman from approximately June 30, 2015 through February 20, 2017 at the Tesoro refinery in Martinez, California.  *See* SAC (Dkt. No. 32) at ¶ 4.  Plaintiff Gurule worked for Defendant as an hourly-paid pipefitter at the Tesoro refinery in Martinez, California, from approximately August 31, 2016 through January 1, 2017, and at the Chevron refinery in Richmond, California from approximately March 21, 2017 through October 31, 2017.  Dkt. No. 55-6 ¶ 2.

Plaintiffs contend that Defendant operates under a policy known as "in on the employee's time and out on the employer's time," under which employees are not paid for the time spent badging in, traveling from a refinery gate to the work site within the refinery, and obtaining and donning required safety gear, but are paid for the time spent removing the required safety gear, traveling back to the gate and badging out at the end of the work day.  Plaintiffs specifically seek to certify a class of 2,361 hourly employees who worked in 49 different job positions, and were members of at least 20 different unions.[2]

Plaintiffs propose two subclasses:  a "Waiting Time Subclass" and a "Wage Statement Subclass."  Dkt. No. 55 at 2.  The proposed Waiting Time Subclass is defined to include all of Defendant's former hourly employees who worked for Defendant in California between February 13, 2015 and the date on which the Court grants certification.  *Id.*  The proposed Wage Statement Subclass is defined to include all of Defendant's former hourly employees who worked for Defendant in California between December 18, 2016 and June 6, 2019 and received paper wage statements that did not have Defendant's full name and address printed on them.  *Id.*

Plaintiffs allege the following causes of action: (1) Defendant violated California's Labor Code and Industrial Welfare Commission (IWC) Wage Order 16 by failing to pay Class members the statutory minimum wage for compensable pre-shift time; (2) Defendants violated Labor Code § 226(a) by failing to provide Class members accurate itemized wage statements; (3) Defendant

---

[2] All of Defendant's hourly employees in California are members of unions.  Dkt. No. 10, Exs. A, C (reflecting unions subject to collective bargaining agreements).

United States District Court
Northern District of California

failed to pay Waiting Time Sub-class members all wages owing upon separation from employment; and (4) Defendant violated Labor Code § 226(a)(8) by failing to provide the Wage Statement Sub-class members with wage statements showing Defendant's complete name and address.  Plaintiffs further alleges that Defendant's conduct violated California Business and Professions Code §§ 17200, et seq. (California's Unfair Competition Law (the "UCL")), and alleges representative claims under California's Private Attorneys General Act, Labor Code §§ 2698, et seq. ("PAGA").

Plaintiffs are seeking class certification specifically as to workers employed at three of Defendant's California projects:  (1) the Chevron Project at Chevron's refinery in Richmond, California ("Chevron Project"), which existed from approximately September 2015 to October 2018 and involved approximately 2,100 of Defendant's non-exempt hourly employees;[3] (2) the Tesoro Avon Wharf MOTEMS Upgrade Project ("Tesoro Project") at the Tesoro refinery in Martinez, California, which lasted from approximately July 2014 to June 2017 and involved approximately 517 non-exempt, hourly employees;[4] and (3) the Phillips 66 HP38 project ("Phillips Project") at the Phillips 66 refinery in Carson, California, which started in approximately May 2019 and is ongoing.[5]  Neither of the Plaintiffs ever worked at the Phillips Project.[6]

### i.    The Chevron Project

At the Chevron Project, employees parked at two different locations, gate 91 and the Kellum parking lot.[7]  At gate 91, employees parked in a lot near the gate and then walked through turnstiles where they would "badge in."[8]  Employees then walked a short distance to a location where they waited for a bus.[9]  The bus took them to a "drop-off point by their break area where

---

[3] Dkt. No. 55-1 Ex. B at 132:6-8; Ex. C at 3:18-4:14 (Defendant's response to Interrogatory No. 3)
[4] Dkt. No. 55-1 Ex. B at 82:16-18; Ex. C at 3:18-4:14.
[5] Dkt. No. 55-1 Ex. B at 174:25-175:2; Ex. C at 3:18-4:14.
[6] As of August 29, 2019, approximately 14 non-exempt, hourly employees had worked for Defendant on this project.  Dkt. No. 55-1 Ex. B at 177:15-23.
[7] Dkt. No. 55-1 Ex. B at 142:17-143:10, 150:14-20, Ex. I at 51:9-16.
[8] Dkt. No. 55-1 Ex. B at 145:10-19, Ex. I at 51:24-52:1, 53:13-54:12; Dkt. No. 55-5 Gray Decl. at ¶¶ 3-4; Dkt. No. 55-7 Weber Decl. at ¶ 7.
[9] Dkt. No. 55-1 Ex. B at 145:24-146:7; Ex. I at 54:13-16; Dkt. No. 55-5 Gray Decl. at ¶¶ 3-4; Dkt No. 55-7 Weber Decl. at ¶ 7.

they [could] drop their personal belongings and then proceed to their designated work area."[10] Defendant estimates that the bus ride would take six to seven minutes to get from the turnstile, where employees badged in, to their designated workplace.[11]  The time employees spent going through security, being transported to their job site, picking up brass, and donning safety gear was unpaid.[12]

At the Kellum parking lot, employees were required to wait for and board a bus in the parking lot.[13]  The bus then drove to gate 9, where a security guard would get on the bus and scan employees badges using a badge reader.[14]  Defendant estimates that it took seven to nine minutes for the bus to drive from the Kellum lot to the worksite.[15]

Of the roughly 2,100 Class members who worked on the Chevron Project, 15 were able to drive their own vehicles to and park them at a third location, the Hensly parking lot.[16] Approximately 21 to 28 other craftspeople and general foremen parked at the Hensly parking lot, but had to ride on a van for 10 to 12 minutes to reach their work locations in the refinery.[17] Finally, approximately eight drivers would go through security, park in the Hensly lot and walk for about one minute to the location where they would pick up their buses.[18]

### ii.    The Tesoro Project

Employees worked at two separate job sites on the Tesoro project:  the Wharf jobsite, with about 75% of the workers, and the Monsanto jobsite.[19]  Employees were paid from the beginning of their shift start time, when they had to be at their "gang box" or work location, and not for any

---

[10] Dkt. No. 55-1 Ex. B at 146:8-21, Ex. I at 56:4-16; Dkt. No. 55-5 Gray Decl. at ¶ 4; Dkt No. 55-7 Weber Decl. at ¶ 7.

[11] Dkt. No. 55-1 Ex. B at 147:4-20; Ex. C at 9:19-23.

[12] Dkt. No. 55-1 Ex. B at 147:23-148:9, Ex. I at 51:6-57:18; Dkt. No. 55-5 Gray Decl. at ¶¶ 3-6; Dkt. No. 55-7 Weber Decl. at ¶¶ 7-10.

[13] Dkt. No. 55-1 Ex. B at 139:23-140:3, 142:17-143:10, Ex. I at 66:2-67:13; Ex. C at 6:12-15; Dkt. No. 55-4 Asiegbu Decl. at ¶ 4.

[14] Dkt. No. 55-1 Ex. B at 139:23-140:3; Ex. I at 68:18-77:9; Dkt. No. 55-4 Decl. at ¶ 4; Dkt. No. 55-7 Weber Decl. at ¶ 4.

[15] Dkt. No. 55-1 Ex. B at 141:11-21; Ex. C at 9:19-22.

[16] Dkt. No. 55-1 Ex. B at 168:3-6.

[17] Dkt. No. 55-1 Ex. B at 170:5-171:12.

[18] Dkt. No. 55-1 Ex. B  at 171:17-21; Ex. I at 46:9-25.

[19] Dkt. No. 55-1 Ex. B at 111:7-12.

United States District Court
Northern District of California

work they had to do before that time.[20]  At the end of the shift, employees were paid for the time removing safety gear, riding the bus, and badging out.[21]

Plaintiffs contend that the process for entering the refinery was very similar for both job sites because employees all were required to park in a designated parking lot and then walk through turnstiles at which they would "badge in" by swiping a badge.[22]  Badging in, although mandatory, did not start an employee's paid time.[23]  After passing through the turnstile, employees working at the Wharf jobsite then were required to take a 10-12 minute, three to four-mile bus or shuttle ride to their job site.[24]  Employees working at the Monsanto job site were required to take a three to five-minute, one-mile bus ride to their job site.[25]

A number of employees on the Tesoro Project, including Plaintiff Parker, worked as bus and shuttle drivers, transporting other employees to their job sites.  According to Defendant, these drivers would drive their own vehicles through the south gate, where they were required to "badge in," and then drive for five or six minutes to the office trailer, all of which was unpaid.[26]

### iii.    The Phillips 66 Refinery

The Phillips Project at the Phillips 66 refinery in Carson, California started in approximately May 2019, and is ongoing.  As of August 29, 2019, approximately 14 non-exempt, hourly employees had worked for Defendant on this project.  Employees park in a designated parking lot before proceeding through a turnstile where they "badge in."[27]  After security, they walk for two minutes to a van that then drives them to their work locations.  The van ride takes three to four minutes.[28]  This happened before the employees' shift start times, and employees were paid only from the designated start of their shift.[29]

---

[20] Dkt. No. 55-1 Ex. B at 90:8-91:7; Ex. D at CHERNE000632; Dkt. No. 55-4 Asiegbu Decl. at ¶¶ 4-9.
[21] Dkt. No. 55-1 Ex. B at 108:21-109:13.
[22] Dkt. No. 55-1 Ex. B at 103:14-104:4, Ex. N at 57:18-59:21, Ex. O at 37:1-41:22.
[23] Dkt. No. 55-1 Ex. B at 103:25-104:10, Ex. O, Rusk Depo. at 38:11-24.
[24] Dkt. No. 55-1 Ex. B at 105:21-106:23; Ex. C, Response to Interrogatory No. 8, at 9:13-15.
[25] Dkt. No. 55-1 Ex. B at 112:25-114:1; Ex. C, Response to Interrogatory No. 8, at 9:15-18.
[26] Dkt. No. 55-1 Ex. B at 118:20-119:13, 120-16.
[27] Dkt. No. 55-1 Ex. B at 178:13-179:7.
[28] Dkt. No. 55-1 Ex. B at 180:6-181:2.
[29] Dkt. No. 55-1 Ex. B at 181:14-19.

United States District Court
Northern District of California

United States District Court
Northern District of California

### iv.    Beginning of Shifts

Although employees were generally required to badge in and out to enter and exit their respective project sites, some employees did not have to badge in or go through security to reach their work area.[30]  The badging process varied by project and parking area.  For example, some employees walked through a turnstile to badge in.[31]  Other employees were badged in by a security guard while they rode on a bus or in their personal vehicle.[32]  Some employees took a company provided bus or shuttle to get to their work area, while others did not.[33]  At the Tesoro Project, some employees were required to park in a designated client-controlled parking lot, walk through a security gate, and then ride a bus provided by Defendant to the jobsite at the start of the workday and back to the gate at the end of the workday.[34]  Some employees were able to drive and park by their work location, and thus would not use company provided transportation at the start or end of the workday.[35]  Employees who did not use a company bus included general foremen, drivers, nightshift employees, and employees who worked at the Vallejo yard.[36]

There were also employees who utilized the bus some days but not others.  Plaintiff Gurule testified that he initially took the bus, but later drove a pickup truck to his work area.[37]  Another potential class member testified that it varied whether he took the bus or his personal vehicle to his work area.[38]  At the Chevron Project, some employees had to park in a controlled parking lot, walk through a security gate, and then ride on a bus to the jobsite, while other employees had to get on the bus before riding through a security gate, which meant that employees' bus rides varied in duration.[39]  Some employees drove and parked by their work location and would not use company or provided transportation at the start or end of the workday.[40]  At the Phillips Project,

---

[30] Dkt. No. 56-1 at 138 (Ex. 7, Coronel Decl. ¶ 5.)
[31] Dkt. No. 55-6, Gurule Decl. ¶¶ 6, 7.
[32] Dkt. No. 56-1 Ex. 1 at 161:1-10; Grover Decl., Ex. C, Rog #5.
[33] Dkt. No. 56-1 Ex. 5 at 86:12-87:25; Dkt. No. 55-6, Gurule Decl. ¶¶ 6, 7.
[34] Dkt. No. 55-6, Gurule Decl. ¶ 9; Dkt No. 55-7, Weber Decl. ¶ 4.
[35] Dkt. No. 56-1 Ex. 1 at 161:1-10; Grover Decl., Ex. C, Rog #5.
[36] Grover Decl., Ex. C, Rog #5.
[37] Dkt. No. 56-1 Ex. 5 at 86:12-87:25; Dkt. No. 55-6, Gurule Decl. ¶¶ 6, 7.
[38] Dkt. No. 56-1 Ex. 7 ¶ 5.)
[39] Dkt. No. 56-1 Ex. 5 at 99:3-100:13; Ex. 6 at 52:5-53:1; Ex. 3 at 44:21-46-3.
[40] Grover Decl., Ex. C, Rog #5.

1   employees had to park in a designated parking lot, walk through a security gate, and then ride on a

2   van to the jobsite at the start of the workday and back to the gate at the end of the workday.[41]

3   Even among those employees who took the bus, their rides varied in duration.[42]

4        Just as there were differences in the means of transportation, there were also differences in

5   whether employees picked up safety gear or brass.  Some employees would pick up and wear fire

6   retardant coveralls before their scheduled start time.[43]  Other employees kept their coveralls with

7   them and would not pick them up at the start of their workday.[44]  Some employees would pick up

8   brass before they went to their work area,[45] while others never picked up brass or only did so for a

9   short period at the project.[46]

10       **v.    Timekeeping**

11       Employees appear to have kept track of their hours worked through paper or electronic

12  timesheets.  Generally, foremen (who are proposed putative class members) would record their

13  time and the time of their crews each day.  Under the labor agreement, "Daily Time Reports are

14  developed by the craft foreman as he implemented [sic] the daily work schedule provided by the

15  Cherne field engineer."[47]  At the end of the workday, employees verified and approved their own

16  hours worked by signing the paper timesheet or approving the electronic timesheet.[48]  If there was

17  an error on the timesheet, employees would have the foreman make the correction before

18  approving the timesheet.[49]

19

20  [41] Dkt. No. 56-1 Ex. 2 at 178:6-180:18.

21  [42] Dkt. No. 56-1 Ex. 6 at 58:16 (first reporting that the bus ride took 12 minutes for part of his
    employment); *id.* at 70:17-18 (reporting 8 to 12 minute bus rides for other parts); Ex. 5 at 84:22-23

22  (reporting 10 to 12 minutes bus rides for part of his employment); *id.* at 87:24-25 (reporting it took
    him 5 to 7 minutes to drive to the work site from the gates).

23  [43] Dkt. No. 56-1 Ex. 6 at 55: 7-12; 56:1-8; 58:17-20.

    [44] Dkt. No. 56-1 Ex. 1 at 160:1-4; Ex. 10 ¶ 6 ("I usually already had a Nomex suit with me from
24  the day before.  Most employees, like myself, typically kept their Nomex suit with them so there
    was no need to pick one up each day."); Ex. 9 ¶ 11 (same); Ex. 7 ¶ 7 (same).

25  [45] Dkt. No. 56-1 Ex. 1 at 97:19-21.

    [46] Dkt No. 56-1 Ex. 10 ¶ 7 ("For most of the time I worked at Tesoro, I did not have to pick up
26  brass."); Ex. 9 ¶ 12 (same); Ex. 7 ¶ 8 (never had to pick up or drop off brass); Ex. 8 ¶ 7 (same)
    [47] Dkt. No. 56-1 Ex. 14 (P66 Pre-Job Conference) at CHERNE 000957; Ex. 1 at 83:25-84:23;
27  237:13-24.
    [48] Dkt. No. 56-1 Ex. 9, ¶ 7 ("My foreman was Robert Coronel.  Coronel recorded my hours
28  worked each day on an iPad.")).
    [49] Dkt. No. 56-1 Ex. 1. at 206:14:18; Ex. 8 ¶ 5.

1

### vi.   Wage Statements

2        Employees were paid once a week and received a wage statement with their paycheck.

3   Employees paid through direct deposit received a hard copy of their wage statement each week.[50]

4   According to Plaintiffs, between December 18, 2016 and June 6, 2019, Defendant issued nearly

5   30,000 wage statements that did not have Defendant's complete legal name or any address.[51]

6        ### vii.   Plaintiff Parker's Experience

7        Plaintiff Parker, like Defendant's other employees, was a member of a union, and was

8   dispatched to work for Defendant from June 2015 to February 2017.[52]   Defendant employed her as

9   a non-exempt bus driver on the Tesoro Project, before she was promoted to foreman about two

10   months into her employment.[53]   Plaintiff Parker did not work on any other project, nor did she

11   hold any other position.[54]   Pursuant to the relevant collective bargaining agreement that applied to

12   Plaintiff Parker, employees needed to be "at their place of work (GANG BOX) at starting time (in

13   on craft time, out to gate on contractor time)."[55]

14        Plaintiff Parker contends that she was required to come in to work early, well before her

15   scheduled workday, to complete pre-shift work.[56]   She claims that although her shift was supposed

16   to start around between 5:45 a.m. and 6:00 a.m., she had to arrive between 5:00 a.m. and 5:15 a.m.

17   to clear security, pick up brass and the fire retardant suit, and prepare the vehicles.[57]   Plaintiff

18   Parker explained that she slept in her car at the refinery for over a year, which is why she typically

19   arrived at the Tesoro Project very early.[58]   For all but six weeks of her employment, Plaintiff

20   Parker drove her car through the front gate and parked next to her worksite.[59]   During the six

21   weeks that she did not drive her car, Plaintiff Parker walked to her work area on foot.[60]

22

[50] Dkt. No. 56-1 Ex. 6 at 44:5-7; Ex. 5 at 73:14-16, 124:22-125:2.
[51] Dkt. No. 55-1 Ex. B at 189:19-191:20; Ex. J, at PARKER 000048 and PARKER 000073; Ex. T (Supp. Response to Interrogatory No. 22).
[52] Dkt. No. 56-1 Ex. 1 at 104:5-19.
[53] Dkt. No. 55-3, Parker Decl. ¶ 3.
[54] Dkt. No. 56-1 Ex. 1 at 92:10-15.
[55] *Id*. at 220:18-222:21 (discussing applicable CBA).)
[56] Dkt. No. 55-3, Parker Decl. ¶ 6.
[57] *Id*.
[58] Dkt. 56-1 Ex. 1 at 107:10-108:7.
[59] Dkt. No. 55-3, Parker Decl. ¶ 7.
[60] *Id*. ¶¶ 12-13.

Plaintiff Parker claims that after going through the gate, she would pick up and don a fire retardant suit, which would take her five minutes.[61]  However, Plaintiff Parker also indicated that she did not always pick up her suit because she sometimes left it in her car overnight.[62]  Plaintiff Parker testified that she would then "pre-trip" her bus, which involved inspecting the bus by checking the tires, hood, windows, floors, seats, transmission fluid, and hoses, cleaning the bus, and filling the tanks with gas.[63]  Plaintiff Parker also testified that before the start of her shift she had to go to the office, pick up radios, get directions from her superintendent, get the flatbed, meet her drivers, and try to hold a safety meeting.[64]  Plaintiff Parker testified that the drivers on her team reported to work at the scheduled start of their workday, not before.[65]

When Plaintiff Parker was promoted to driver foreman, which is still an hourly employee position, she took on a supervisory role.  In that role, Plaintiff Parker was responsible for recording her time and her drivers' time.  Plaintiff Parker claims she would only enter the scheduled start and end time, rather than the actual hours worked because her superintendent refused to give her overtime.[66]  Yet, Plaintiff Parker recorded over 1,730 hours of overtime (at double her hourly rate) for a total amount exceeding $88,000.[67]

With regard to the Wage Statement Subclass, Plaintiff Parker contends that she received "many […] wage statements" without the name and address of the employer.[68]  Plaintiffs initially failed to present any incomplete wage statements from the alleged class period (i.e., December 28, 2016 to June 6, 2019).[69]  Plaintiff Parker also testified that although she did not check every wage statement, she received earning statements every Friday that listed the full employer name and address.[70]  As part of her reply (Dkt. No 57), Plaintiffs included paystubs from the wage statement

---

[61] *Id*. ¶ 8.
[62] Dkt. No. 56-1 Ex. 1 at 160:1-4.
[63] Dkt. No. 55-3, Parker Decl. ¶ 10; Dkt. No. 56-1 Ex. 1 at 88:19-89:1-6; 181:24-182:7.
[64] Dkt. No. 56-1 Ex. 1 at 88:22-23; 148:19-20; 148:24-149:11.
[65] *Id*. at 87:4-88:16.
[66] *Id*. at 85:15-21, 89:7-14.
[67] Dkt. 56-2 Declaration of Andre Pessini, ¶ 4.
[68] Dkt. No. 55-3, Parker Decl. ¶ 22.
[69] Mot. at 10, n.55 (referring to Ex. J, PARKER 000048 which pre-dates the alleged class period, and PARKER 000073, which also pre-dates the period, and includes the full-name and address of the employer.))
[70] Dkt. 56-1 Ex. 18 (Earning Statement for Beatrice Parker); Ex. 1 at 208:20-210:16 (discussing

class period that demonstrate the alleged deficiency described in the motion by failing to list Defendant's full name and address.[71]

## II.    LEGAL STANDARD

Plaintiffs bear the burden of showing by a preponderance of the evidence that class certification is appropriate under Rule 23 of the Federal Rules of Civil Procedure. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). Class certification is a two-step process. First, Plaintiffs must establish that each of the four requirements of Rule 23(a) is met: numerosity, commonality, typicality, and adequacy of representation. *Id.* Second, Plaintiffs must establish that at least one of the bases for certification under Rule 23(b) is met. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Where, as here, Plaintiffs seek to certify a class under Rule 23(b)(3), they must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"[A] court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim.'" *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013) (quoting *Wal–Mart*, 564 U.S. at 351). Nevertheless, Rule 23 does not permit "free-ranging merits inquiries at the certification stage." *Id.* at 466. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* If a court concludes that the moving party has met its burden of proof, the court has broad discretion to certify the class. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir.), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001).

"[A] class representative must be a part of the class and possess the same interest and suffer the same injury as the class members." *General Telephone Co. of Southwest v. Falcon*, 457

---

Ex. 18). Similarly, other employees testified that they received complete wage statements. Dkt 56-1 Ex. 5 at 127:3-25 (confirming that he believed wage statements included the full employer name and address); Ex. 6 at 51:1-23 (confirming he always knew who the employer was and what its address was).

[71] *See* Dkt. No. 55-1, Ex. T; Ex. 1, Supplemental Declaration of Eric A. Grover in Support of Plaintiff's Motion for Class Certification.

United States District Court
Northern District of California

United States District Court
Northern District of California

U.S. 147, 156 (1982); *see also Lee v. State of Or.*, 107 F.3d 1382, 1390 (9th Cir. 1997) (explaining that standing is a jurisdictional element that the plaintiff must satisfy before class certification). The burden of establishing standing falls upon the plaintiff. *Bennett v. Spear*, 520 U.S. 154, 167 (1997) ("each element of Article III standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation").

## III.   DISCUSSION

### A.   Plaintiffs Fail to Satisfy Rule 23(a) for the Waiting Time Subclass.  Plaintiffs Satisfy Rule 23(a) for the Wage Statement Subclass.[72]

#### i.   Plaintiffs Have Satisfied The Numerosity Requirement

Plaintiffs contend that they have met the numerosity requirement because Defendant employed thousands of employees during the class period.  Defendant contends that Plaintiffs "adduce[] no evidence about the number of individuals who allegedly worked off the clock or received incomplete wage statements."  Opp. at 13.  Numerosity is satisfied when "the class is so numerous that joinder of all members is impractical."  FRCP 23(a)(1).  No precise number establishes numerosity, although even a number larger than 40 generally has been considered sufficient.  *See Rannis v. Recchia*, 380 Fed. Appx. 646, 651 (9th Cir. 2010); *Wortman v. Air New Zealand*, 326 F.R.D. 549, 556 (N.D. Cal. 2018).

Defendant estimates that there are approximately 2,631 class members, and provides detailed numbers of employees who worked on the Chevron project (2,100), the Tesoro Project (517), and the Phillips project (14).  The Court is satisfied that joinder of all class members is impractical.  To the extent Defendant stresses that the size of the class, the number of unions, and the number of different occupations creates challenges for class certification, that argument equally favors the numerosity requirement being met.  Plaintiffs thus satisfy the numerosity

---

[72] As an initial matter, Defendant argues that Plaintiff cannot seek certification of her direct wage statement claim because she has failed to demonstrate that she received wage statements that allegedly violate Labor Code § 226(a)(8).  As discussed below, although it concerns the Court that Plaintiffs initially failed to produce the very wage statements alleged to be deficient, because Plaintiffs eventually produced those statements, the Court finds that Plaintiffs have standing to seek certification of this Wage Statement Subclass.

1    requirement.

2           **ii.**   **Plaintiffs' Waiting Time Subclass Lacks Commonality.  Plaintiffs' Wage**
3               **Statement Subclass Establishes Commonality.**

               a.  <u>Plaintiffs' Waiting Time Subclass Lacks Commonality</u>
4

5           To proceed as a class action, a claim must be supported by a common contention that is "of

6    such a nature that it is capable of class wide resolution—which means that determination of its

7    truth or falsity will resolve an issue that is central to the validity of each one of the claims in one

8    stroke."  *Dukes*, 564 at 350.  Plaintiffs frame the question as "whether the pre-shift time that Class

9    members uniformly spent clearing security, traveling from the front gate to the first work site of

10   the day, and obtaining and donning safety gear was compensable time under California law."

11   Mot. at 14.

12           As the Supreme Court stated in *Dukes*, the commonality analysis is "rigorous."  564 U.S.

13   at 350.  Plaintiffs accordingly may not simply assert a "any common question"—rather, they must

14   define a question that "will produce a common answer" to the question that will drive the

15   resolution of the litigation.  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011)

16   (citing *Dukes*, 564 U.S. at 349).  And the Supreme Court has rejected the premise that providing

17   "local supervisors" with discretion comprises a "uniform employment practice."  564 U.S. at 356.

18           As in *Dukes*, Plaintiffs here have not presented evidence of a "common mode of exercising

19   discretion that pervades the entire company."  *Id*.  Instead, the Court has substantial evidence

20   before it that each employee's experience is individualized and unique.  Plaintiffs point to a

21   negotiated provision in the CBA—"in on employee's time and out on the employer's time"—to

22   support the contention that Defendant's policy was "identical for all hourly employees across all

23   three projects."  Plaintiffs contend that the very existence and nature of this policy creates a

24   common issue of fact and law.  Reply at 1.  But Plaintiffs ignore that a facially uniform policy can

25   be applied differently, and that employees may not act uniformly notwithstanding the policy.  In

26   other words, the existence of a common policy alone does not create commonality under Rule 23,

27   nor does it make class certification appropriate.  For example, the Ninth Circuit recently held in

28   *Davidson v. O'Reilly Auto Enterprises, LLC*, 2020 WL 4433118, at *8 (9th Cir. Aug. 3, 2020),

United States District Court
Northern District of California

12

that with regard to a "rest break" class the plaintiff "failed to show that 'there are questions of law or fact common to the class'" because plaintiff was unable to show "that employees suffered the common injury of being deprived of rest-period premiums to which they were legally entitled." *Id.* This was true even though a facially defective written policy existed. *Id.* at *9 ("Put another way, the mere existence of a facially defective written policy—without any evidence that it was implemented in an unlawful manner—does not constitute '[s]ignificant proof,' [] that a class of employees were subject to an unlawful practice.") (citations omitted).[73]

Plaintiffs' evidence also contradicts their commonality assertions. First, Plaintiffs describe the "policy" to mean that employees "were not paid any wages for the pre-shift time from the badge in point at the front gate to the first work site." Mot. at 14. This description appears to be inaccurate, as there are obvious differences in the application of the provision to over 2,600 putative class members, some of whom were in fact compensated for time spent moving from the badge in point to the work area.[74] "In on employee's time" involved different steps for different employees. For some employees, this meant walking a short distance from their car to the work area.[75] For other employees, this meant riding a bus, van, or shuttle from a parking lot to their work area for varying durations.[76] And for some employees this meant picking up brass, while other employees testified that they did not pick up brass.[77] Similarly, for some employees, being "in on employee's time" did not result in any unpaid work.[78] The evidence shows that class

---

[73] Plaintiffs contend that Defendant's evidence of disparate and uncommon treatment reflects exceptions and does not focus on "the other 99% of workers." Reply at 2. While the Court disagrees with that characterization, particularly in light of the evidence regarding Plaintiff Parker, Plaintiffs do not appear to dispute that these disparate applications occurred.

[74] Dkt. 56-1 Ex. 9, Kniss Decl. ¶7 ("I started getting paid when I badged in at the turnstile and was on the clock and paid until I badged out (other than for unpaid lunch breaks)."); Ex. 7, Coronel Decl. ¶ 9 ("While I worked at Cherne, I recorded all of my work time and was paid for all of the time that I worked. I never did any work for free or 'off the clock.'").

[75] *Id*. Ex. 1 at 161:1-6 (explaining that she could drive through the gates once she became a foreman.)

[76] *Id*. Ex. 3 at 59:4-14 (30-minute bus ride to work area); Ex. 6 at 70:3-4, 16-18 (reporting 8 to 12 minute bus rides); *id*. at 87:24-25 (reporting it was taking him 5 to 7 minutes to drive to the work site from the gates); Ex. 8, Gibbs Decl. ¶ 6 (15-minute drive to get from parking lot to work site).

[77] *Compare* Dkt. No. 55-5, Gray Decl. ¶ 4 (explaining he had to pick up brass); Dkt. No. 55-4, Asiegbu Decl. ¶ 6 (same) *with* Ex. 7, Coronel Decl. at ¶ 8 (did not pick up brass); Ex. 8, Gibbs Decl. at ¶ 7 (same); Ex. 9, Kniss Decl. ¶ 12 (same); Ex. 10, Preston Decl. ¶ 7(same).

[78] Dkt. 56-1 Ex. 9, Kniss Decl. ¶7 ("I started getting paid when I badged in at the turnstile and was on the clock and paid until I badged out (other than for unpaid lunch breaks.")

13

United States District Court
Northern District of California

members were not subject to a uniform policy, the legality of which could be addressed in "one stroke." *See, e.g., Overton v. Walt Disney Co.*, 136 Cal. App. 4th 263 (Cal. 2006) (holding that employees assigned to a lot one mile away from entrance were not entitled to compensation where defendant did not require them to take the shuttle).[79]

Plaintiff Parker's experience further highlights the lack of uniformity across the proposed class. Plaintiff Parker testified that when she arrived at work she completed several tasks, including driving to the gate, clocking in at the gate, going to the office to pick up radios, talking to her boss, getting a flatbed truck and pre-tripping the flatbed, traveling to another gate to get on her bus, inspecting her bus, and then starting her shift.[80] "In on employee's time"—which is the only policy that Plaintiffs cite—means that employees should be at their place of work at the start of their shift. However, based on the above evidence, the Court finds that Plaintiffs have not meet their burden, and instead that any work arguably performed "off-the-clock" by Plaintiffs and proposed class members was sufficiently different to preclude a finding of commonality.[81]

### b. Plaintiffs' Wage Statement Subclass Claims Establish Commonality

With respect to the Wage Statement Subclass, Plaintiffs contend that the primary legal question is whether Defendant issued wage statements that did not contain all of the information required by Labor Code § 226(a)(8). California Labor Code § 226(a) provides, in relevant part:

> An employer, semimonthly or at the time of each payment of wages, shall furnish to his or her employee, either as a

---

[79] Pursuant to Local Rule 7-3(d)(2), Plaintiffs submitted a statement of recent decision: the California Supreme Court's opinion in *Frlekin v. Apple Inc.*, S243805, 2020 WL 727813 (Cal. Feb. 13, 2020). Dkt. No. 59. There, employees at Apple retail stores underwent exit searches under a policy that required mandatory searches of employees' bags and other personal property before leaving the store. *Id.* at *1. The employees alleged, among other things, that Apple failed to pay minimum and overtime wages for time spent waiting for and undergoing Apple's exit searches, in violation of California law. The California Supreme Court unanimously held that even though Apple employees are not required to bring personal items to work, those who do are under the company's control for up to 20 minutes while they are waiting to be screened, and therefore must be paid. However, there are obvious differences between the situation in *Frlekin*, where all employees had to undergo the same bag check, at the same store, for nearly identical waiting time periods, and the situation here, which involves 2,500 employees in 49 jobs with 20 unions, and implicates busing and other transportation, the donning of uniforms and protective gear, and other dissimilar issues.

[80] Dkt. 56-1 Ex. 1 at 88:19-89:6; 182:1-7; Dkt. No. 55-3, Parker Decl. ¶ 10.

[81] As noted, Plaintiff Parker recorded over 1,736 hours of overtime and double time pay over the course of two years. Dkt. 56-2 Declaration of Andre Pessini, ¶ 4.

14

detachable part of the check, draft, or voucher paying the employee's wages, or separately if wages are paid by personal check or cash, an accurate itemized statement in writing showing (1) gross wages earned, (2) total hours worked by the employee, except as provided in subdivision (j), (3) the number of piece-rate units earned and any applicable piece rate if the employee is paid on a piece-rate basis, all deductions, provided that all deductions made on written orders of the employee may be aggregated and shown as one item, net wages earned, (6) the inclusive dates of the period for which the employee is paid, (7) the name of the employee and only the last four digits of his or her social security number or an employee identification number other than a social security number, (8) the name and address of the legal entity that is the employer and, if the employer is a farm labor contractor, as defined in subdivision (b) of Section 1682, the name and address of the legal entity that secured the services of the employer, and (9) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee and, beginning July 1, 2013, if the employer is a temporary services employer as defined in Section 201.3, the rate of pay and the total hours worked for each temporary services assignment.

Cal. Lab. Code § 226(a).

Plaintiffs first contend that the wage statements "uniformly fail to list the correct total hours worked, gross wages earned, net wages earned, applicable hourly rates, and number of hours worked at each rate." Mot. at 10. Plaintiffs also contend that Defendant's "practice" was to "issue[] wage statements that failed to include the name and legal address of the legal entity that was the employer." Mot. at 18.

To support certification of the Wage Statement Subclass, Plaintiffs initially presented two wage statements. Mot. at 10 n.55. Defendant argued that both statements cover pay periods outside the alleged class period, and noted that one of the statements includes the full name and address of the employer. As part of the Reply, Plaintiffs included paystubs from the wage statement class period that reflect the deficiency described in the motion (*i.e.*, failing to display Defendant's full name and address).[82] Defendant further contends that Plaintiff Parker testified that she tore off and discarded a portion of these wage statements that included the allegedly

---

[82] *See* Dkt. No. 55-1, Ex. T; Dkt. 57-1 Ex. 1, Supplemental Declaration of Eric A. Grover in Support of Plaintiff's Motion for Class Certification PARKER000085, PARKER000086, PARKER000093.

United States District Court
Northern District of California

missing information,[83] and that she received wage statements that contained Defendant's complete legal name and address every pay period.[84]  Some employees also testified that they did not notice information missing from their wage statements.[85]

The Court find that Plaintiffs have made a sufficient threshold showing regarding the Wage Statement Subclass.  Defendant argues that "[a]bsent evidence supporting her claim—and in the presence of conflicting evidence—the Court cannot make any factual or legal determination as to whether over 2,600 employees suffered the same (if any) injury."  The Court finds that because Plaintiffs (1) produced wage statements—albeit only on reply—that did not contain Defendant's full name and address, and (2) Defendant has admitted that it provided 28,343 wage statements to 1,816 employees during the class period without Defendant's full name and address, Plaintiffs Wage Statement Subclass meets the commonality standard.[86]

### iii.   Plaintiffs' Waiting Time Subclass Does Not Satisfy Typicality.  Plaintiffs' Wage Statement Subclass Satisfies Typicality.

"The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal quotations omitted).  Thus, "[t]ypicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought."  *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014).

The Court finds that Plaintiffs' Waiting Time Subclass claims are not typical.  As noted in the above discussion of commonality, the action is clearly based upon conduct unique to the Named Plaintiffs, and the experiences and claimed injuries of other putative class members are

---

[83] Dkt. 56-1 Ex. 1 at 203:21-24.
[84] *Id*. at 209:13-24.
[85] Dkt. 56-1 Ex. 3, at 76:11-22 ("Q: Did [the wage statement] have the full company name, Cherne Contracting Corporation, on it? A: Yes . . . Q: [D]id it have the -- Cherne's address on it?  A: Yes."); Ex. 11, Winn Decl. ¶ 7 ("I never noticed any information missing from my paystubs."); Ex. 10, Preston Decl. ¶ 11 (same); Ex. 9, Kniss Decl. ¶ 13 (same).
[86] Dkt. 55-1 Ex. T (Supp. Response to Interrogatory No. 22) ("Between December 18, 2016 and June 6, 2019, Cherne issued 28,343 paper checks to 1,816 different craft, hourly employees.  In approximately May 2019, Cherne discovered that a clerical oversight resulted in its address and full name not appearing on the paper wage statements….").

markedly different.  With respect to the Waiting Time Subclass, Plaintiffs contend that a uniform policy applies to all putative class members.  However, Plaintiffs have not set forth evidence showing that the relevant policy at issue uniformly resulted in uncompensated time for a putative class of over 2,600 employees who worked at different locations, worked different shifts, and held different positions.  Plaintiff Parker's own testimony confirms that her claims are not typical, as other employees on her team did not arrive early and suffered none of the alleged harm.[87]  The pre-shift tasks that Plaintiffs performed— where they rode the bus, picked up brass or equipment, and badged in—are all evidence that Plaintiff's experience might be typical of a certain subset of the Waiting Time Subclass.  However, the experiences of other putative class members show significant variation within the entire class of 2,600 employees.

The same cannot be said for the Wage Statement Subclass.  Plaintiff has identified the foundation for the allegedly missing information from her wage statements, and presented evidence that permits the Court to make the factual and legal determination that certain wage statements were legally inadequate.  Given that Plaintiff has presented indisputably unlawful wage statements to the Court, the Court finds that Plaintiffs' experiences in this regard are typical of those of the proposed class members.

Accordingly, the Court finds that Plaintiffs' Waiting Time Subclass claims are not typical of the class, but that their Wage Statement Subclass claims are typical.

### iv.    Plaintiffs Are Adequate Class Representatives

Rule 23(a)(4) requires that class representatives "fairly and adequately protect the interests of the class."  The Ninth Circuit has established a two-prong test for this requirement: "(1) [d]o the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *See Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).

Plaintiffs have no apparent or known conflicts.  Plaintiffs appear knowledgeable about the claims, regularly communicate with counsel, have responded to written discovery, have provided

---

[87] Dkt. 56-1 Ex. 1. at 85:17-16:16 (team drivers "refused to . . . com[e] in early" and instead "started coming in at the exact [start] time").

17

documents, and have participated in depositions.  The Court finds that both Plaintiffs are committed to participating in this case to the extent necessary and to fairly, adequately, and vigorously protecting the Class.

**B.** **Plaintiffs Satisfy The Requirements Of Rule 23(b)(3) As to the Wage Statement Subclass**[88]

Federal Rule of Civil Procedure 23(b)(3) requires two findings:  (1) predominance of common questions over individual ones and (2) superiority of the class action mechanism.  *See Pryor v. Aerotek Scientific, LLC*, 278 F.R.D. 516, 531 (C.D. Cal. 2011).

**i.** **Common Issues of Law and Fact Predominate**

To establish predominance, Plaintiffs carry the burden to show that (1) the issues raised by the claims are capable of "proof at trial through evidence that is common to the class"; and (2) that the damages resulting from that injury [are] measurable on a class-wide basis through use of a common methodology.  *Comcast Corp. v. Behrend*, 569 U.S. 27, 30 (2013).  The predominance standard is "far more demanding" than Rule 23(a)'s commonality requirement.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997).

On the record before it, the Court finds that common issues of law and fact predominate as to this claim.  Defendant's failure to provide the statutorily required information on wage statements can violate the Labor Code.  For purposes of class certification, whether the wage statements at issue were legally deficient is a common question of law and fact that predominates over individual issues.  If, however, in the course of discovery it becomes clear that Plaintiffs' Wage Statement Subclass involves a dispute about the actual number of hours a putative class member worked, such an inquiry will likely require an individualized inquiry into the class members' work history potentially making class treatment inappropriate.  *See Norris–Wilson,* 270 F.R.D. at 610.  If that is the case, Defendant may move for decertification at that time.  However,

---

[88] The Court need not reach the second part of the class certification analysis under Rule 23(b) as to the Waiting Time Subclass because the Supreme Court has made clear that Rule 23(b)(3)'s predominance requirement is "even more demanding" than the commonality requirement of Rule 23(a).  *See Comcast*, 569 U.S. at 34 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997)).  Because Plaintiffs have not met the commonality requirement under Rule 23(a), they have also failed to meet the more demanding predominance requirement under Rule 23(b).

the Plaintiff has identified the foundation for the allegedly missing information from her wage statements, and presented evidence that would permit the Court to make sufficient factual or legal determinations.

Accordingly, Plaintiffs have met the predominance requirement with respect to the Wage Statement Subclass.

### ii.    Superiority of Class Action

Rule 23(b)(3) requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy," and mandates that courts consider "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D).  Plaintiffs must therefore establish that deviation from the normal course of litigation to a class action is the "superior" method for adjudicating the claims. *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1235 (9th Cir. 1996).  As noted above, Defendant has admitted that it issued 28,343 wage statements to 1,816 employees that lacked its full name and address.  Given Defendant's apparent ability to specifically determine the number of deficient wage statement and employees, the Court does not foresee undue difficulties in managing a class action based on the wage statements.  And adjudication of the wage statement claims on a class, rather than individual, basis promotes judicial efficiency.

Accordingly, class treatment is superior.  For the foregoing reasons, Plaintiffs have satisfied the Rule 23(b)(3) requirements.

### C.    Plaintiffs' UCL Claim Cannot be Certified

Plaintiffs acknowledge that the "UCL claims are predicated on and directly derivative of the underlying wage and hour violations discussed above.  To the extent that those wage-and-hour claims are certifiable under Rule 23, so too should be the UCL violation." *Guifu Li v. A Perfect Franchise, Inc.*, 2011 WL 4635198, at *15 (N.D. Cal. Oct. 5, 2011) (certifying UCL claim for same wage-and-hour violations certified under Rule 23).  Because the Court denies the motion for class certification as to the wage-and-hour claims, the UCL cause of action also cannot be certified.

//

### D.     The PAGA Claim is Not Before the Court for Certification

Plaintiff seeks civil penalties under PAGA based on the "same factual bases" as the underlying claims.  Mot. at 11.  A number of courts in this circuit have concluded that representative PAGA claims are not subject to the Rule 23 class certification requirements.  *See* Mot. at 21 n. 104 (citing cases).  Courts have also held that PAGA claims cannot be tried on a representative basis when resolution of the claims presents manageability issues.  *See* Opp. at 25 (citing cases).  The Ninth Circuit recently reviewed the question in *Canela v. Costco Wholesale Corp.*, 965 F.3d 694, 705 (9th Cir. 2020), holding that a PAGA claim cannot be brought as a "class action" under the Class Action Fairness Act.  Because only the Motion for Class Certification is before the Court, and Plaintiffs contend that Rule 23 certification is not necessary for the PAGA claims, the issue of whether PAGA claims are also required to be certified pursuant to Rule 23 is not currently before the Court.

## IV.   CONCLUSION

For these reasons, Plaintiffs have failed in part to make the required showing for class certification, and the Court accordingly **DENIES** the motion for class certification as to the Waiting Time Subclass and **GRANTS** the motion as to the Wage Statement Subclass.

The Court **SETS** a further telephonic case management conference for December 8, 2020, at 2:00 p.m.  All counsel shall use the following dial-in information to access the call:

Dial-In: 888-808-6929

Passcode: 6064255.

For call clarity, parties shall NOT use speaker phone or earpieces for these calls, and where at all possible, parties shall use landlines. The parties are further advised to ensure that the Court can hear and understand them clearly before speaking at length.  The parties are **DIRECTED** to file by December 1, 2020 a joint case management conference statement with a proposed schedule for resolving the case, including a proposed trial date.

In light of the above ruling on the motion for class certification, Defendant is also **DIRECTED** to file a statement of no more than 5 pages within fourteen (14) days from the date of the entry of this Order indicating whether Defendant seeks to move forward with its Motion for

Summary Judgment.  If Defendant intends to move forward with that motion, the Court will address it in a separate order.

     **IT IS SO ORDERED.**

Dated:  November 20, 2020

HAYWOOD S. GILLIAM, JR.
United States District Judge